The STATE of Texas, Appellant,

v.

NORTHBOROUGH CENTER, INC. and Regency Savings Bank, FSB, Appellees.

No. 14–97–00823–CV

Court of Appeals of Texas, Houston (14th Dist.).

Feb. 25, 1999.

---

Douglas P. Ray, Houston, for appellant.

H. Dixon Montague, Billy Coe Dyer, Charles Black McFarland, Houston, for appellees.

Before Justices MAURICE E. AMIDEI, EDELMAN, and WITTIG.

## OPINION

DON WITTIG, Justice.

Appellant, the State of Texas, appeals the judgment entered in favor of appellees, Northborough Center, Inc. and Regency Savings Bank, FSB (collectively "Northborough"). In three points of error, the State complains the trial court erred in (1) finding there is a material and substantial impairment to the remainder, (2) admitting the testimony of a witness not qualified as an expert, and (3) admitting evidence of appraisal values which differed from those values stated in Northborough's answers to the State's interrogatories. We affirm.

### I. Background

This is an eminent domain case in which the State, acting through the Texas Department of Transportation, acquired 0.174 acres (7,568 square feet) of a 4.0817 acre tract from Northborough for the widening of Interstate 45 North ("I–45") in Houston. A Commissioner's Hearing was held on November 27, 1990, at which time Northborough was awarded $585,000 compensation for both the value of the condemned property and damage to the remainder. Northborough filed an objection to the commissioner's decision asserting it had not received just compensation. The State filed an objection claiming the award was excessive. On April 19, 1991, the award was deposited with the clerk of the trial court. Northborough filed a motion to withdraw the $585,000, which the trial court granted on May 2, 1991. The State subsequently took possession of the condemned property and commenced construction on I–45.

Prior to the commencement of the jury trial, the trial court held a hearing to determine whether there was a material and substantial impairment of access to the remainder. *See State v. Wood Oil Distrib., Inc.,* 751 S.W.2d 863, 865 (Tex.1988) (holding the trial court is required to make a determination on impairment of access prior to trial). The trial court found the improvements to I–45 resulted in a material and substantial impairment of access to the remainder. At the trial on damages, the jury awarded Northborough

$2,319,141 for both the property condemned and damage to the remainder. The trial court entered judgment on the jury's award and prejudgment interest in the amount of $1,041,435 for total judgment in the amount of $3,360,576.

The subject property is located on the west side of I–45. In 1983, a six-story office building, with ground level parking and an attached two-level parking garage, providing parking for more than 500 vehicles, was constructed on the property. The building fronts on the southbound frontage road of I–45, but does not abut any other road. Before the taking, access to the property from the frontage road was provided by two driveways, located approximately 200 feet apart, one at the north end of the property, and one at the south end. The property extended 333 feet along the frontage road. A landscaping berm, six to eight feet in height, was located between the building and the frontage road extending the length of the property between the two driveways.

The State condemned a strip of land approximately 22 feet wide adjacent to the frontage road, bisecting the landscaping berm lengthwise. The State constructed a retaining wall varying in height from six to eight feet to support the remaining portions of the berm. Prior to the taking, the frontage road was two lanes wide; after the taking, the frontage road was expanded to three lanes at the north end of the property and four lanes at the south end of the property. Also, prior to the condemnation, the Greens Road exit ramp was located below the south driveway; after the taking, the exit ramp was placed in front of the property, between the north and south driveways. Northborough eventually closed the south driveway.

### II. Impairment of Access

In its first point of error, the State complains the trial court erred in finding there was a material and substantial impairment of access to the remainder of Northborough's property. Whether access has been materially and substantially impaired is a question of law. *See State v. Heal,* 917 S.W.2d 6, 9 (Tex.1996). Questions of law are

reviewed without deference to the trial court's determination. *Id.*

With respect to the taking of property, the Texas Constitution provides:

No person's property shall be taken, damaged or destroyed for or applied to public use without adequate compensation being made . . .

TEX. CONST. art. I, § 17. A direct physical invasion of property is not required under the Texas Constitution to entitle an owner to compensation. *See DuPuy v. City of Waco,* 396 S.W.2d 103, 108 (Tex.1965). The law in Texas regarding the right to access is well-settled:

[A]n abutting property owner possesses an easement of access which is a property right; that this easement is not limited to a right of access to the system of public roads; and that the diminution in the value of property resulting from a loss of access constitutes damage.

*Id.*

The Texas Supreme Court's seminal case on impaired access is *DuPuy v. City of Waco. DuPuy* involved the construction of the South 17th Street viaduct in Waco. *Id.* at 104. No property of DuPuy, the land owner, was physically appropriated for the construction of the viaduct, but the viaduct itself impaired access to the property. *Id.* Prior to the construction of the viaduct, DuPuy's property fronted on South 17th Street and sided on an alley connecting with another street. *Id.* The viaduct elevated South 17th Street above DuPuy's property, leaving access to the front under the viaduct between the supporting columns and dead-ending at DuPuy's property. *Id.*

The State argued DuPuy's property had not been damaged because he still had complete access to the system of public roads. *Id.* at 106. In finding that DuPuy had been deprived of "reasonable access" entitling him to compensation, the court explained:

Prior to the construction of the viaduct the property of DuPuy fronted on South 17th Street with full access thereto; now, South 17th street [sic] is fourteen feet above the property and a concrete support forms a solid barrier to the immediate right of DuPuy's building. As a result, the building is left fronting on a cul-de-sac under the viaduct.

*Id.* at 110.

A few years after *DuPuy,* the supreme court further defined when a land owner can recover for impairment of access. *See City of Waco v. Texland Corp.,* 446 S.W.2d 1 (Tex.1969). In *Texland Corp.,* the court modified the rule announced in *DuPuy* and stated:

property has been damaged for a public use within the meaning of the Constitution when access is materially and substantially impaired even though there has not been a deprivation of all reasonable access . . .

*Id.* at 3.

*Texland Corp.* also involved the South 17th Street viaduct in Waco. *Id.* at 2. Texland Corp. was located in the manufacturing and warehousing district, an area zoned for heavy industrial uses. *Id.* at 4. Texland Corp. fronted on two streets with South 17th Street as the primary ingress and egress into the property. *Id.* The viaduct, supported by piers five feet in diameter, elevated vehicular traffic over Texland Corp.'s property. *Id.* Texland Corp. was in the business of warehousing and transporting stored goods, which involved the use of large commercial trucks. *Id.* Testimony revealed that the piers supporting the viaduct interfered with the trucks' ability to maneuver in backing and parking to such an extent that the warehouse could not be used for its intended purpose because the trucks could not access the property. *Id.* Although the property could still be accessed, the court determined there was a material and substantial impairment of access because the access for which Texland Corp.'s property was specifically intended was rendered unreasonably deficient. *Id.*

Northborough asserts the placement of the exit ramp materially and substantially impairs access to the remainder. Prior to the taking, the Greens Road exit ramp was located below the south driveway. With the construction of the freeway, the exit ramp was relocated directly in front of the Northborough property. Northborough claims the location of the exit ramp violates both the

State's minimum design standards and sound engineering judgment. Under the State's minimum standards for the placement of an exit ramp as set forth in the Operations and Procedures Manual of the State Department of Transportation, a driveway may not tie into a frontage road within 250 feet forward and 50 feet behind the "intersection of travelways" of the exit ramp and frontage road. This limitation is the "minimum access denied zone." The intersection of travelways is the point where the exit ramp and frontage road merge into each other.

Both Northborough's and the State's experts testified the minimum access denied zone is established as a safety measure. Its purpose is to prevent cars, which are exiting the freeway on to the frontage road, from cutting across other lanes of traffic to make a sharp right turn into a driveway. The property's south driveway is only 40 feet forward of the intersection of travelways, 210 feet less than the State's minimum standard. The denied access zone in front of the Northborough property is above and below the south driveway, but does not include the south driveway. Ordinarily, the property owner abutting the road is not allowed to place a new driveway within an already established denied access zone. On certain conditions, the State may make an exception to allow an existing driveway to remain open even when it falls within a denied access zone.[1] Prior to the time of the taking, the State had included the south driveway in the minimum access denied zone.

Northborough's experts, Vernon Henry, a certified land planner, and Mike McInturff, a licensed civil engineer specializing in traffic and transportation issues, testified that the location of the exit ramp to the south driveway allows vehicles exiting the freeway to access the south driveway without sufficient room to cross three lanes of traffic on the frontage road. The State's experts also recognize this potential problem. George Thompson, hired by the State to address the impact of the taking, testified that vehicles exiting the freeway should not, as a safety precaution, have the opportunity to make a hard right turn immediately upon reaching the frontage road.

Based on the high speed and volume of traffic on the frontage road and the exit ramp, Henry and McInturff both testified the location of the exit ramp makes the south driveway unsafe to use thereby rendering it inoperable. For safety concerns, they believe the south driveway must remain closed. The State presented testimony and evidence that it has plans to put in double white lines and signs prohibiting traffic from crossing those lines. McInturff, however, stated such a remedy does not physically prohibit a vehicle from accessing the south driveway and that drivers would ignore such a traffic regulation. Dexter Jones, an employee of the Department of Transportation for 32 years and now in private consulting, also testified drivers ignore the double white lines. Jones, therefore, recommended to the State that a six-inch curb be constructed from the exit ramp past the south driveway to prevent vehicles exiting the freeway from turning into the south driveway. The State did not follow this recommendation.

Jim Darden, Director of Project Development at the Highway Department, testified, at the time of construction, the exit ramp could have been placed below the south driveway because there were no driveways immediately south of Northborough, avoiding the access issue. Darden testified the only justification for not complying with the minimum access denied standard is that it would have materially and substantially damaged Northborough's property, which would have resulted in a high cost to the State of obtaining the access rights.

The State concedes the closing of the south driveway would impair access to the property. At the hearing, Tim Newton, design engineer for the Department of Transportation, stated in his opinion if the south driveway were to be rendered useless, the proper-

---

1. Northborough argues the State violated its own standards by placing the exit ramp within 250 feet of the south driveway. The State argues its interpretations of its own regulations are entitled to deference. We need not address these arguments for the disposition of this point of error. Whether access to the property has been materially and substantially impaired is not dependent upon whether the State violated the design standards for the placement of the exit ramp.

ty would be substantially and materially damaged. Moreover, in January 1991 prior to the date of taking, the Texas Attorney General's office recognized the "potential for substantial loss or damages in this case," cautioning the Department of Transportation "that the position taken by the appraisers for the landowners appears to be credible and [the State] may have substantial difficulty in the trial of this case." In a memorandum to his superiors, Assistant Attorney General Jeff Avant stated with regard to Northborough's property:

> [A]though the existing driveways will not be prohibited, a denial of access will occur, which may affect future development potential; ...

\* \* \*

There is a significant risk of increased exposure for damages to the remainder ... If damages are awarded it is reasonable to expect that damages in the range of 5% to 15% of the value of the remainder may be awarded ... I estimate a 50% chance that such damages will be awarded. There is also a recognizable chance that damages up to 28.4% or $1,750,000 will be awarded.

There is insufficient support for the proposition that the remainder is not damaged. There is clearly a proximity issue. Also, there is potential damage due to denial of access ...

\* \* \*

The access is in an unusual configuration. Clearly an exception was made in this case, to allow the southernmost existing driveway to remain. After construction of the new exit ramp, the driveway will be closer to the ramp than standard design criteria allowed. The landowners have already alleged that the Highway Department is trading their safety to save money damages. It will be difficult for the highway

department engineering witness to maintain a disinterested, credible appearance when explaining this exception ... The potential loss is $1,256,373, plus the cost of litigation ...

The State, although recognizing that there would be a material and substantial impairment if the south driveway were closed, argues it is not necessary to close the south driveway because it is safe. Newton concluded that the south driveway is "reasonably safe" because the double white lines and signs prohibit crossing over and frontage road traffic is low volume. Stuart Corder, an employee of the Department of Transportation, also believes the south driveway is "reasonably safe." Contradicting Newton, he states frontage road traffic is high volume, but does not consider that to be a significant factor.

The State characterizes the situation in this case as an increase in traffic hazards, which constitutes nothing more than inconvenience. *See Heal*, 917 S.W.2d at 11 (holding that plaintiff's assertion where "the new configuration might create some confusion, be more hazardous, and result in more difficulty in turning left into [the property owner's] driveway because of increased traffic and the bottleneck that would form in front of their property," was evidence of inconvenience, not material and substantial impairment). Northborough does not contend that accessing its property is impaired due to increased traffic, but instead bases its claim upon physical obstructions caused by the exit ramp and the retaining wall. Moreover, the evidence presented in this case, unlike that in *Heal*, constitutes more than mere inconvenience. First, Northborough introduced a substantial amount of evidence demonstrating that the placement of the exit ramp made accessing the south driveway a safety hazard thereby, forcing its closure. The closing of the south driveway left the property with only one means of access.[2] Furthermore, Northbor-

---

**2.** Northborough claims that not only has one-half of its access been completely denied, the closing of the south driveway further affects the internal circulation of the property, particularly in the parking area located underneath the building. Prior to the closing of the south driveway, the

north driveway was the designated entrance and exit for reserved tenant parking for the north half of the property and for delivery vehicles, while the south driveway was the designated entrance and exit for reserved tenant parking for the south half of the property and for visitor parking,

ough presented evidence that its only access was rendered more hazardous to use by the reduction in the visibility of frontage road from the driveway, the reduction in turning radius, and the reduction of the throat length of the driveway.

■ The State's pleadings alleged 70% of Northborough's access would be taken. *See State v. Munday,* 868 S.W.2d 319, 320 (Tex. 1993) (taking 28.5% of property owner's access). Moreover, unsafe access may constitute the basis for material and substantial impairment of access. *See Precast Structures, Inc. v. City of Houston,* 942 S.W.2d 632, 637 (Tex.App.-Houston [14th Dist.] 1996, no writ) (holding the taking of an exit making access difficult and dangerous for trucks carrying 125–foot beams materially and substantially impaired access). Here, the placement of the exit ramp forcing the closure of one of two driveways for a property specifically designed to function with two, combined with factors rendering the remaining means of access more hazardous, leaves access to Northborough's property materially and substantially impaired. The State's first point of error is overruled.

### III. Expert Witness

■ In its second point of error, the State claims the trial court erred in admitting the testimony of Vernon Henry as an expert because he is not a licensed engineer, architect, or landscape architect. The State does not attack the reliability basis of Henry's opinion.

■ The Texas Rules of Evidence permit a witness qualified as an expert by knowledge, skill, experience, training, or education to testify on scientific, technical, or other specialized subjects if the testimony would assist the trier of fact in understanding the evidence or determining a fact issue.

*See Gammill v. Jack Williams Chevrolet, Inc.,* 972 S.W.2d 713, 718 (Tex.1998); TEX. R. EVID. 702. There are no definitive guidelines, however, for determining whether a witness's education, experience, skill, or training qualifies him as an expert. *See America West Airlines, Inc. v. Tope,* 935 S.W.2d 908, 918 (Tex.App.-El Paso 1996, no writ); *Western Atlas Int'l, Inc. v. Wilson,* 930 S.W.2d 782, 787 (Tex.App.-Tyler 1996, writ denied); *James v. Hudgins,* 876 S.W.2d 418, 421 (Tex.App.-El Paso 1994, writ denied). Whether a witness is qualified to offer expert testimony is within the trial court's discretion. *See United Blood Servs. v. Longoria,* 938 S.W.2d 29, 30 (Tex.1997). Abuse of discretion is gauged by whether the trial court acted without reference to any guiding rules or principles. *E.I. du Pont de Nemours & Co. v. Robinson,* 923 S.W.2d 549, 558 (Tex.1995). The burden of establishing the witness's qualifications as an expert is on the offering party. *Gammill,* 972 S.W.2d at 718.

Under Texas law, a person may engage in the practice of engineering, architecture, or landscape architecture if he is licensed in those professions. *See* TEX.REV.CIV. STAT. art. 3271a, § 1.2 (Vernon Supp.1999) (engineering); TEX.REV.CIV. STAT. art.249a, § 1 (Vernon Supp.1999) (architecture); TEX.REV.CIV. STAT. art. 249c, § 5(a) (Vernon Supp.1999) (landscape architecture). The State complains Henry was allowed to testified as to matters requiring expertise in surveying, engineering, architecture, and landscape architecture even though he is not licensed in any of those professions. Therefore, because Henry is not licensed, he was not qualified to testify as an expert. *See Prellwitz v. Cromwell, Truemper, Levy, Parker & Woodsmale,* 802 S.W.2d 316, 318 (Tex. App.-Dallas 1990, no writ) (holding that witness giving expert opinion regarding stan-

---

which is located on the top floor of the garage via the entrance ramp located at the garage's south side.

Because Northborough was forced to close the south driveway, all vehicles must enter and exit through the north driveway. Therefore, vehicles accessing the south end of the property must pass through the parking area underneath the building, often passing vehicles going in the opposite direction. Henry testified the property

was not designed to accommodate that type of cross circulation. The aisles in the parking area under the building are 16 to 17 feet wide. According to Henry, to accommodate two-way traffic, aisles should be at least 25 feet wide. The increased cross vehicular traffic also creates problems for pedestrians accessing the elevator lobby. The State's expert, Thompson, also stated Northborough's property was not designed to function with only one driveway.

dard of care for particular licensed profession must hold license for same profession); *but see Southland Lloyd's Ins. Co. v. Tomberlain*, 919 S.W.2d 822, 827 (Tex.App.-Texarkana 1996, writ denied) (rejecting rule announced in *Prellwitz* ).

The Texas Engineering Practice Act, although requiring an individual to have a license to practice engineering, does not require an individual to be a licensed engineer when testifying or preparing exhibits to be presented at trial:

> Nothing in this Act Shall be construed or applied so as to prohibit or in any way restrict any person from giving testimony or preparing exhibits or documents for the sole purpose of being placed in evidence before any administrative or judicial tribunal of competent jurisdiction.

TEX.REV.CIV. STAT. ANN. art. 3271a, § 20(h) (Vernon Supp.1999).

Moreover, there is no language in Rule 702 which can be construed as requiring a witness to have a license in order to testify as an expert. *See Tomberlain*, 919 S.W.2d at 827. The Texarkana court of appeals explained: "A requirement that an expert witness hold a professional license does not comport with the language or purpose of Rule 702. The rule is meant to insure that if specialized knowledge will help the trier of fact examine the evidence, a person who has acquired such knowledge through any one of a number of methods may testify based on that knowledge." *Id.*

At the pretrial hearing, Henry testified he is the principal in a firm of city planning consultants and landscape architects. Although not a licensed architect, Henry holds two degrees in architecture. He is further certified by the American Institute of Certified Planners. As a land planner, Henry evaluates property for its highest and best use, devises plans for development of the property, obtains necessary governmental approval for subdivision platting, driveway permits, and road configurations, and coordinates all these activities for actual development of the property.

Moreover, Henry testified he has worked on a number of projects involving direct access to feeder roads of major freeways and, in the course of such work, has become familiar with the Highway Department's design criteria regarding the placement of driveways. He has a working knowledge of government regulations which may affect how streets intersect and he works with such regulations on a daily basis. Henry also testified that in reaching his conclusions, he consulted with Mike McInturff, a licensed engineer specializing in traffic and transportation issues, and with Virgil Stoeffer, a professor of engineering at Texas A & M University, who both concurred with his opinions.

Based upon Henry's knowledge, background, education, and extensive professional experience in land planning, the trial court did not err in permitting Henry to testify as an expert on the effects of the taking on Northborough's property.[3] The State's second point of error is overruled.

## IV. Appraisal Values

In its third point of error, the State complains the trial court erred in allowing testimony regarding appraisal values on the remainder which were different from those values Northborough had indicated would be contended at trial.

In response to the State's interrogatories, Northborough referenced the State to a November 1995 appraisal report by its expert, David Lewis, in which Lewis stated the damages to the remainder were $2,077,922. The State contends on appeal that it was improper for the court to allow Lewis to testify that the damages to the remainder were $2,222,724 because Northborough failed to supplement its answers to interrogatories with the updated appraisal value. The State has failed to preserve its complaint for appellate review on two levels. First, the State failed to object to the admission of the exhibit showing the $2,222,724 figure. A party may not raise a ground for

---

**3.** There being no complaint regarding the reliability basis of Henry's opinions, it is not neces-

sary for us to address that prong.

appeal without first raising the complaint in the trial court. *See Kershner v. State Bar of Texas,* 879 S.W.2d 343, 347–48 (Tex.App.-Houston [14 th Dist.] 1994, writ denied). Second, a review of the record reveals that the State objected to the admission of evidence regarding the valuation contained in another supplemental expert report that had valued damages at $3,139,115, not the $2,222,724 valuation. A complaint on appeal must conform to that made at trial, otherwise it is waived on appeal. *See Knoll v. Neblett,* 966 S.W.2d 622, 639 (Tex.App.-Houston [14 th Dist.] 1998, pet. denied). The State's third point of error is overruled.

Accordingly, the judgment of the trial court is affirmed.