

# In The
# Court of Appeals
# Seventh District of Texas at Amarillo

No. 07-12-00546-CV

TYSON FRESH MEATS, INC., APPELLANT

V.

MAHDEY ABDI, APPELLEE

On Appeal from the 108th District Court
Potter County, Texas
Trial Court No. 98,050-E, Honorable Douglas Woodburn, Presiding

May 28, 2014

## MEMORANDUM OPINION

Before QUINN, C.J., and HANCOCK and PIRTLE, JJ.

Tyson Fresh Meats, Inc. (Tyson) appeals from a judgment rendered in favor of Mahdey Abdi (Abdi). The latter was injured while working at Tyson's meat-packing plant. His arm was crushed after becoming stuck in a conveyor belt he attempted to clean. The belt was off when Abdi began his task but somehow engaged before the job was completed. Suit followed, wherein Abdi accused Tyson of negligence in failing to 1) have a delayed start signal before the belts were energized and 2) properly train him in

"lock-out procedures." Trial was to a jury, which rendered a verdict favoring Abdi. Judgment was entered upon that verdict, and this appeal ensued.

Tyson poses six issues for review. Three concern the admission of expert testimony proffered by a Dr. Johnston, while the others pertain to the admission of accident reports, jury argument, and the factual sufficiency of the evidence underlying an award of damages. We affirm.

*Admission of Expert's Testimony*

We first address the matter of Johnston's expert testimony. Tyson asserts that it was inadmissible on three grounds. We review the complaints under the standard of abused discretion. *Whirlpool Corp. v. Camacho,* 298 S.W.3d 631, 638 (Tex. 2009) (stating that admission of expert testimony is reviewed under the standard of abused discretion). That standard prohibits us from interfering with the trial court's decision unless it deviated from controlling guidelines, rules, or principles or was otherwise unreasonable or arbitrary. *Brinker v. Evans*, 370 S.W.3d 416, 422 (Tex. App.—Amarillo 2012, pet. denied). Finally, the burden lies with the appellant to establish that the trial court abused its discretion. *Id*.

*Statutory Bar*

Through its first issue, Tyson argues that "the trial court's admission of . . . Johnston's testimony contravenes an express statutory prohibition against such testimony. Johnston testified as to professional engineering issues about which he is statutorily prohibited from testifying." That is, "the Texas Occupational Code . . . expressly states that an individual without a valid and active engineering license is prohibited from 'providing an expert engineering opinion or testimony.' TEX. OCC.

2

CODE §§ 1001.301; 1001.355; 1001.003(c)(1)," "Johnston's engineering license . . . [was] inactive" when he testified, and he "was, therefore, statutorily prohibited from offering an expert engineering opinion." We overrule the issue.[1]

Statute requires active licensure before one may engage in the "practice of engineering." *See* TEX. OCC. CODE ANN. § 1001.301(a) (West 2012); § 1001.355(a) (stating that a license holder on inactive status may not practice engineering). Furthermore, the "practice of engineering" is defined as "the performance of or an offer or attempt to perform any public or private service or creative work, the adequate performance of which requires engineering education, training, and experience in applying special knowledge or judgment of the mathematical, physical, or engineering sciences to that service or creative work." *Id.* § 1001.003(b). It also encompasses "consultation, investigation, evaluation, analysis, planning, engineering for program management, *providing an expert engineering opinion or testimony*, engineering for testing or evaluating materials for construction or other engineering use, and mapping." *Id.* § 1001.003(c)(1) (Emphasis added). However, the statute "does not . . . prohibit or otherwise restrict a person from giving testimony or preparing an exhibit or document for the sole purpose of being placed in evidence before an administrative or judicial tribunal, subject to the board's disciplinary powers under Subchapter J regarding negligence, incompetency, or misconduct in the practice of engineering." *Id.* § 1001.004(e)(2).

---

[1] Abdi proffered Johnston as an expert in "human factors" and "industrial safety." Moreover, Tyson's counsel stated below that "[a]s a human factors expert, while I may quarrel with him [Johnston] about whether he can do it or not, or he's experienced enough, *I don't think* under a Robinson/Daubert challenge on that single issue of human factors . . . that -- that he is disqualified." (Emphasis added).

3

Though "judicial tribunal" is not defined in the statute, the plain meaning of "judicial" connotes "of or relating to a judgment, the function of judging, the administration of justice, or the judiciary," MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 677 (11th ed. 2003), while the plain meaning of "tribunal" includes "a court or forum of justice" or "something that decides or determines." *Id.* at 1335. The parameters established by those definitions easily encompass a court of law such as the district court at bar. Thus, a trained engineer holding an inactive license, like Johnston, would not be prohibited from offering an expert opinion during a trial. *Tidwell v. Terex Corp.*, No. 01-10-01119-CV, 2012 Tex. App. LEXIS 7724, at *32-34 (Tex. App.—Houston [1st Dist.] August 30, 2012, no pet.) (mem. op.) (holding that the trial court did not abuse its discretion in permitting an unlicensed engineer to render an expert opinion because it "could have found that the Occupation Code did not prohibit Closson's testimony because it fell within the testimonial exception"); *State v. Northborough Ctr., Inc.*, 987 S.W.2d 187, 194 (Tex. App.—Houston [14th Dist.] 1999, pet. denied) (holding the same after applying the similarly worded predecessor to § 1001.004(e)(2)).[2] So, § 1001.003(c)(1) did not *ipso facto* bar Johnston from testifying as an expert.

We further note that the Texas Rule of Evidence governing experts and their testimony, that is, Rule 702, says nothing about one needing a license to testify as an

---

[2] We note Tyson's effort to distinguish both *Tidwell* and *Northborough* because neither purportedly focused on the omission of the word "expert" in § 1001.004(e)(2) or its predecessor. It may be that § 1001.003(c)(1) uses the word in describing what constitutes the practice of engineering. Yet, to suggest that because the legislature omitted the word "expert" when permitting unlicensed engineers to testify in a "judicial tribunal" somehow means it never intended such an individual to render an expert opinion in a "judicial tribunal" is an unacceptable application of the rules of statutory construction. Section 1001.004 expressly addresses testimony in a court of law, while § 1001.003 addresses the general practice of engineering and the provision of expert testimony in general. So, what we have here is the legislature selecting a specific instance or setting wherein an unlicensed engineer may testify and, thereby, removing him from the generality of § 1001.003(c)(1). And, as we know, statutes addressing specific matters are to be interpreted as governing statutes addressing general matters. *See In re Platinum Energy Solutions*, 420 S.W.3d 342, 346, 348 (Tex. App.—Houston [14[th] Dist.] 2014) (orig. proceeding).

expert. The rule mentions qualifications based on knowledge, skill, experience, training or education, not licensure. TEX. R. EVID. 702. So, an expert is not obligated to have a license to testify under the Supreme Court's own rules of evidence if the person is otherwise qualified under Rule 702. *Tidwell v. Terez Corp., supra; State v. Northborough Ctr., Inc., supra.*

*Unqualified*

Through its second issue, Tyson argues that the trial court erred in allowing Johnston to testify about the lack of a delayed warning system because he "failed to meet the legal standard under Texas Rule of Evidence 702 to qualify as an expert in the design and implementation of such systems." We overrule the issue.

Again, the applicable standard of review is one of abused discretion. Under it, we cannot simply substitute our own judgment for that of the trial court. Our obligation is to defer to the trial court's decision if it comported with controlling guidelines. With this in mind, we also note the teaching of *Mack Trucks v. Tamez,* 206 S.W.3d 572 (Tex. 2006). There we are told that expert witnesses may testify if the opinion is relevant and based on a reliable foundation. *Id.* at 578. And, in applying *Mack Trucks* and the standard of review, we begin by focusing on the reason for which Johnston was proffered and the nature of his testimony.

Abdi called Johnston as an expert on "human factors" and industrial safety.[3] As such, he investigated industrial accidents and their causes. And while Johnston

---

[3] According to Johnston:

. . . human factors is a specialty area that basically recognizes that . . . the human is not perfect. We -- human beings have tremendous capabilities, but they also have certain limitations, and the human factors field recognizes this. And when they're designing tools or equipment or workplaces or office furniture, what have you, they try to design those tools and equipment and facilities to take into consideration the capabilities of the human, but also the limitations, and try to match that with the characteristics of the

5

acknowledged that he had not designed a delayed warning system or seen one in a meat-packing plant, he also attested that he "cannot give testimony, as an engineer, and [he] cannot do engineering . . . [he is] not giving testimony as an engineer." Rather he was testifying "as a certified safety professional." He further explained, in response to a query about whether he was "pretty near an expert on just about any topic anybody is willing to pay you for," the witness replied:

> No, that's not true. I'm an expert in the narrow relationship between the human and that product. I'm not an expert in any of those products. I couldn't design any of those products. So those products were designed by mechanical and electrical engineers, which I'm not. The human factors field and the safety field looks at that relationship between the user of the equipment or the user of the product and looks to see if it is safe. And if it's unsafe, they recommend ways to make it safer. They don't do the work, but an electrical engineer or a mechanical engineer will come in and make those modifications. So the human factors, we look at a really narrow aspect. That's the human machine or the human product interface and that's the area of my expertise. And, yes, it involves a lot of different products over some 40 years.

---

equipment to make that tool or equipment as efficient and effective as possible. For instance, in the automobile, the human factors would be designing the seats so not only for comfort, but for all -- all different age groups to be able to reach the controls and lay out the controls in a way. So that's what human factors -- it's kind of the optimum -- it's trying to design for optimum human use, to make it easy and safe for humans to use.

\*       \*       \*

Industrial safety -- and it's sometimes referred to as occupational safety -- that's everything that's involved in providing a safe workplace. It involves training the individual. It involves the equipment that they're going to use, to make sure that the equipment is maintained properly. It involves safe work procedures, so that the people know how to do their work. It involves getting safety rules and safety procedures. It involves safety inspections because you can't just make a bunch of rules and say here's the rules, because we know that some people may break the rules or what have you. So you -- it involves the adequate supervision to make sure that the rules are being followed. All -- everything that goes into trying to prevent injuries, prevent accidents, and make the job as safe as practical.

\*       \*       \*

Another part of industrial safety is the actual products that they use, to make sure that those products have taken human factors into consideration, and that those products are relatively safe for the way that they are meant to be used.

6

The substance of his testimony also focused upon the absence of safety items from the bone room wherein Abdi received his injuries. He talked about such things as the lack of warning signs and audible or visual warning devices. Moreover, his testimony about the need for such devices or warning measures was based upon industry safety standards developed by the American Society of Mechanical Engineers or ASME and made applicable to conveyor belts. He further said that ASME standards were relied upon by "certified safety professionals" like him.

The ASME standard deemed applicable was that numbered B20.1. It provided, among other things, that: 1) a conveyor that would cause injury when started, shall not be started until personnel in the area are alerted by a signal or designated person that the conveyor is about to start; 2) when a conveyor that would cause injury when started is automatically controlled or must be controlled from a remote location, an audible device or devices shall be provided that can be clearly heard at all hazardous points along the conveyor where personnel may be present; 3) the audible warning shall be actuated by the controller device starting the conveyor and continue for a required period of time before the conveyor starts; 4) a flashing light or similar visual warning may be used in conjunction with or in place of the audible device if a visual warning is more effective; and 5) where system function would be seriously hindered or adversely affected by the required time delay, or where the intent of the warning may be misinterpreted, (*e.g*, in a work area with many different conveyors and allied devices) a clear, concise, or legible warning sign shall be provided and the warning sign shall indicate that conveyors and allied components may be started at any time, that danger exists, and that personnel must keep clear.

More importantly, in assessing whether Johnston was indeed qualified as an expert, the trial court heard an excerpt from the deposition of Tyson's own expert concerning ASME standards. He said: "Yes, I believe the ASME standards do apply," though he did not "believe that they indicate that an *audible* warning would apply in this case." (Emphasis added). We are not directed to anything of record indicating that the same witness believed the visual warning standards of ASME B20.1 were inapplicable. Not only was this concession by Tyson's expert heard by the trial court when deciding whether to qualify Johnston as an expert but it also contradicts Tyson's present contention that "Johnston . . . expressed engineering opinions that were inconsistent with industry standards." Again, Tyson's expert told the court the standards applied to the industry involved.

And, to the extent that Johnston purportedly offered an opinion about the design of a warning system when describing the location at which the safety measures should be installed, it appears the observation was also based on the very same ASME standard. As mentioned above, one of its subparts stated that "when a conveyor that would cause injury when started is automatically controlled or must be controlled from a remote location, an audible device or devices shall be provided that can be clearly heard *at all hazardous points* along the conveyor where personnel may be present." (Emphasis added). Johnston opined that the locales at which the warning devices should have been installed on the Tyson conveyor belt system were the "pinch points" within the system. He compared them to rollers installed on old washing machines through which the user rolled wet clothes to remove excess water. "From a human factors standpoint, you would want to locate . . . [the warnings] near the pinch point,

8

near the roller . . . *that's the danger point* . . . ," according to Johnston. (Emphasis added). So, it can be said that the witness was not actually designing a safety system but applying ASME safety standards to a conveyor designed by others.

In short, it may well be that Johnston was not qualified to testify about the design and implementation of safety systems. Yet, that was not the focus of his testimony. Abdi proffered him as a human factors and industrial safety expert. His expertise dealt with analyzing the safety measures implemented in various industries via the application of, among other things, ASME standards that Tyson's expert reluctantly deemed relevant. While his opinions could affect the design of industrial mechanisms, like conveyor belts, he left their design to others. We further add to that Tyson's acknowledgement of Johnston as being a qualified human factors expert. These indicia provided ample basis upon which the trial court could have reasonably concluded that Johnston was not attempting to design a safety system but rather was opining about ASME safety measures that engineers should consider in designing equipment. So, we do not consider the decision to admit the witness' testimony as an instance of abused discretion.

*Expert Testifying as a Fact Witness*

Tyson next contends that "no scientific, technical, or other specialized knowledge was necessary to determine whether Tyson failed to properly train the Plaintiff." Accordingly, Johnston's testimony on this issue allegedly was outside the scope of expert testimony allowed by Rule 702, and the trial court's admission of such testimony was an abuse of discretion. We overrule the issue.

Again, the standard of review is one of abused discretion. Next, an expert witness may testify on matters where specialized knowledge will assist the trier of fact to understand evidence or to determine a fact in issue. TEX. R. EVID. 702. Furthermore, expert testimony assists the trier of fact when the expert's knowledge is beyond that of the average juror. *K-Mart Corp. v. Honneycutt,* 24 S.W.3d 357, 360 (Tex. 2000). What Tyson asserts here is that the jury did not need expert testimony from Johnston on whether Abdi was properly trained since a fact witness could have testified about the matter. Yet, Johnston was not simply asked whether Abdi received proper training on the lock-out/tag-out system in general. He also endeavored to explain why the training was deficient, and that was influenced by his expertise in human factors and industrial safety.

The record illustrates that Tyson trained its employees working at the conveyor belts on the use of its lock-out/tag-out system. So too does it illustrate that Abdi attended such a classroom training session. When asked, though, whether "just showing an employee in a classroom how to move that knife disconnect from on to off and put a lock on it would . . . qualify him to go out on Tyson's floor and lock and tag out a conveyor belt . . . ," Johnston replied: "In my opinion, it would not." In answer to being asked "why not," the witness said such things as 1) "[b]ecause it's not specific to whatever he's locking out, the actual -- that's just the first step," 2) "[y]ou still need to go to the specific equipment that's out there, to locate where that box is and locate where all the other features of that piece of equipment is," and 3) classroom training was insufficient because "[t]hey should demonstrate on the actual equipment that they're locking out, that they know how to complete the entire lockout procedure." The witness

10

also indicated that knowing how to look at a notebook and find an equipment specific lockout/tagout procedure did not actually qualify an employee to tagout that item. So, when asked if Abdi was sufficiently trained ". . . when he was injured on BT-4 [bone table 4] based on what you know about the training that he had received, and the location where he was injured . . . ," Johnston said, "Not in my opinion."

It has to be remembered that the foregoing testimony was proffered by a "human factors" expert and "certified safety professional" retained to investigate the cause of accidents.[4] And, it is the task of a "human factors" expert, according to Johnston, to consider the "capabilities" and "limitations" of the human being "and try to match [them] with the characteristics of the equipment to make that tool or equipment as efficient and effective as possible." The "tool" or "equipment" in question at the time was the lockout/tag-out mechanism utilized by Tyson, and Johnston was explaining why, given his experience with and consideration of human "capabilities" and "limitations," the training provided was not enough. So, more was being asked than simply whether Tyson trained Abdi. The trial court could have reasonably interpreted Johnston's testimony as effort to explain for the jury that learning something in a classroom does not necessarily mean the student knows the subject. Purportedly more was needed here, and it involved the provision of actual experience with or in the subject matter being taught. While some people learn through their own experience that experience is the best teacher, we cannot say that reiterating the truism to a jury fell outside the expertise of someone like Johnston who was trained in people, their capabilities, their limitations, and their understanding.

---

[4] We reiterate that Tyson acknowledged Johnston to be an expert in "human factors." Implicit in that acknowledgement is the concession that such an expertise exists. Indeed, one cannot be an expert in a non-existent field, and Tyson does not contend here that no such field exists.

Simply put, the trial court had to exercise its discretion to decide if Johnston's specialized knowledge in the realm of "human factors" would assist the trier of fact in understanding why the training was deficient. The manner in which it exercised its discretion cannot be faulted as unreasonable or as a deviation from controlling rules or guidelines under the circumstances it had before it.

*Admission of Accident Reports*

Tyson next complains of the admission into evidence of two accident reports prepared by employees of Tyson. One was prepared by a nurse employed by Tyson and was based on information provided by Abdi. The other was prepared by Bobby Archie and was based on information learned from another employee named Jones. As such, they allegedly constituted inadmissible hearsay. We overrule the issue.

Abdi and the nurse testified at trial, as did Jones and Archie via their depositions. Furthermore, portions of their testimony as well as other evidence proffered at trial covered the substance of what was said in both reports. So, the content of those reports was redundant of other evidence admitted into the record without objection.

To the extent that Tyson found one aspect of the nurse's report troubling (*i.e.,* the suggestion that the accident was not caused by deviating from a safety rule or regulation), that matter was broached again by counsel for Abdi while reading from Jones' deposition. More importantly, Tyson did not object when Abdi revisited it. We further note that the Jones deposition excerpt read by Abdi's counsel expressly contradicted what the nurse said about the accident having no connection to some deviation from safety protocol. Given these circumstances, we cannot say that the admission of the two reports, if error, was harmful. *Benavides v. Cushman, Inc.*, 189

S.W.3d 875, 885 (Tex. App.—Houston [1st Dist.] 2006, no pet.) (holding that inadmissible evidence is rendered harmless when similar evidence is admitted elsewhere without objection).[5]

*Improper Closing Argument*

Tyson's next issue concerns allegedly improper, incurable jury argument. The argument consisted of the following:

> This is a company - - Tyson is a huge company. They are responsible for processing food that you eat, that we all eat, that our society eats. They won't even follow the OSHA regulations. What do you think they're doing out there on the regulations regarding the safety of food? What do you think they're doing? We've proven that they don't even follow the regulations for OSHA, for the safety of their employees. How do you think they feel about your safety? How do you think they feel about my safety?

No objection was made to it during trial. However, Tyson complained of it via a motion for new trial. Though that preserved the issue for review, the delay foisted upon the same party the obligation of establishing that the argument was incurable. *Cottman Transmission Sys., L.L.C. v. FVLR Enters., L.L.C.,* 295 S.W.3d 372, 379 (Tex. App.— Dallas 2009, pet. denied).

Incurable jury argument is rare. *Living Ctrs. of Texas, Inc. v. Penalver,* 256 S.W.3d 678, 681 (Tex. 2008). But, it arises when, by its nature, degree, and extent, the argument constituted such error that an instruction to disregard could not remove its effects. *Id.* at 680-81. That is, the argument must strike at the appearance of and the actual impartiality, equality, and fairness of the justice rendered by courts. *Id.* at 681. Previously recognized types of incurable argument have included: (1) appeals to racial

---

[5] Tyson also believes it suffered prejudice because the jury asked to see the nurse's report. Yet, we are cited to and found nothing of record suggesting that the information perused in that report differed from the evidence already admitted elsewhere without objection. So, the inference of harm arising from the jury's request is founded simply on speculation.

prejudice; (2) the use of inflammatory epithets such as "liar," "fraud," "faker," "cheat," and "imposter"; and (3) unsupported charges of perjury and witness tampering. *Id.* at 681; *Wilhoite v. Sims*, 401 S.W.3d 752, 763 (Tex. App.—Dallas 2013, no pet.). To reiterate, the focus lies on whether the argument, when considered in its proper setting, was reasonably calculated to cause such prejudice to the opposing litigant that a withdrawal by counsel or an instruction by the court, or both, could not eliminate the probability that it resulted in an improper verdict. *Living Ctrs. Of Texas, Inc. v. Penalver*, 256 S.W.3d at 681, *quoting Tex. Employers' Ins. Ass'n v. Haywood*, 153 Tex. 242, 266 S.W.2d 856 (1954). Finally, we generally presume that jurors follow the instructions provided them by the court. *Columbia Rio Grande Healthcare, L.P. v. Hawley*, 284 S.W.3d 851, 862 (Tex. 2009).

Though improper, the argument before us was a relatively brief, one-time comment. It encompassed neither inflammatory epithets, appeals to racial or other reprehensible prejudices, nor false accusations implicating the integrity of the judicial process. Furthermore, Tyson cites us to no authority holding jury argument akin to that at bar was incurable. Consequently, we are unable to find it of the ilk that could not have been remediated by a timely and proper instruction from the trial court.

*Factual Sufficiency of Evidence of Past Lost Earnings*

Finally, Tyson argues that the evidence is factually insufficient to support the jury's award of past lost earnings. It believed that Abdi should have recovered no more than $19,050. Its argument is founded upon the supposition that the applicable period of loss was that between the date of injury and the date on which he was cleared to return to work. Yet, lost wages refers to the actual loss of income due to the inability to

14

perform a specific job from the time of injury to *the time of trial*. *Scott's Marina at Lake Grapevine Ltd. v. Brown*, 365 S.W.3d 146, 158-59 (Tex. App.—Amarillo 2012, pet. denied); *Koko Motel, Inc. v. Mayo,* 91 S.W.3d 41, 51 (Tex. App.—Amarillo 2002, pet. denied). The latter period here was approximately three years.[6] Additionally, Abdi was making about $450 per week at the time of the accident. Multiplying $450 (the sum received weekly) by 4 (the average number of weeks in a month) by 36 (the number of months in three years) derives a product of $64,800. So, the overwhelming weight of evidence shows that Abdi was entitled to much more than the $19,050 suggested by Tyson. We overrule the issue.

Having overruled each issue, we affirm the judgment.


Brian Quinn
Chief Justice

---

[6] The accident happened on September 9, 2009, and Abdi was medically cleared to return to work on July 27, 2010. However, he never returned because he still suffered pain and weakness in his arm and hand sufficient to prevent him from doing his job. Instead, he periodically sold cars and earned at most $500 per week. Some weeks he earned nothing at all. Furthermore, trial of the cause was held on August 28-31, 2012, about thirty-six months after the incident.